Good morning. Let's see. Good morning, your honors. May it please the court. Matthew McReynolds on behalf of the plaintiffs and appellants, Jonee Fonseca and Life Legal Defense Foundation, I'd like to reserve five minutes of my time for rebuttal if I may. In this case, for the discretion applied to doctors and physicians making decisions to end life support of their patients without their patient's consent. This was done in the context of Article 3 standing. The court actually held that our clients had injury in fact under Article 3 standing, which is normally the highest hurdle, but then it proceeded to find that they did not have causation and redressability. And we think that the way the court approached causation and redressability was a significant departure from what this court has said about those two things as well as what the state courts have said about patients' rights of self-determination. So I'd like to focus on that in the next few minutes. There are also issues in this case raised of the 11th Amendment immunity. The directors raised those for the first time on appeal in the Rooker-Feldman Doctrine. If the court has questions about those, we can get to that as well. But on causation and redressability, what the court has said about Article 3 causation, particularly in the Maya v. Syntex Corporation case, is that it's a standard that is less than proximate causation. And what the district court did here was, in effect, to erect a barrier that was greater than proximate causation. The court again and again noted — But could I ask you, what is the causation? So I don't know if you say CUDA, the C-U-D-D-A, if we say CUDA. Say there's an — say the California legislature gets mad at the Ninth Circuit and writes a statute that says all Ninth Circuit judges are dead. Would I be able to highlight my right to life? I'm confused about how the announcement of what CUDA says actually affects or causes any problem with a right to life or a right to make medical decisions. Sure, Your Honor. What happened in this case, what we've pled is that the causation is that the — but the courts in this State, first the Placer County Superior Court and then the Los Angeles County Superior Court, looked at the death certificate that was issued by the director and essentially barred any further evidence as to whether or not our client and his child was actually alive. Well, maybe they were wrong. I mean, I think if you'd like us to review the State court decisions, you're going to have a Rooker-Feldman problem. So I'm not sure we can assume they were right or wrong. We're looking at this statute and we're trying to figure out, does the statute cause anyone to be dead? And I don't see how it does. Sure. And that goes somewhat to the merits as well, Your Honor, which haven't been raised, been briefed below. But our theory is, and we've pled this in a number of places throughout the complaint, starting in the introduction, that CUDA imposed some mandatory obligations on the doctors and physicians that they felt constrained to act within. What are those mandatory requirements? Take a look in the record. One of the best places that this is set forth is in a brief by Kaiser, page 6. But I need to look at — I think you're bringing a facial challenge to CUDA. So how do I look at what any doctor at Kaiser says? Don't I have to look at what the law that you're challenging says? And I don't see any mandatory requirements. We're actually bringing both, Your Honor. We're bringing a facial and an as-applied challenge to CUDA. And so, pages 693 and page 702 of the record — So, okay, let's — sorry, let me just break that apart so I understand. Fonseca is bringing an as-applied challenge, but LLDF can't be bringing an as-applied challenge, can they? Well, actually, they can because they were assisting Ms. Fonseca in Placer County and then again in L.A. Superior. But I don't think you can use resources on the same litigation and count that as an injury for organizational standing, can you? Well, I don't know why not, Your Honor. I think because our cases say you can't. I will defer to Your Honor's recollection on that. I'm not aware of those cases. But they are bringing the facial challenge as well. Okay. So let's focus on the facial challenge for a moment. So if there's a facial challenge, you were starting to tell us what's in the record, but I'm not sure I — maybe you could finish that and explain why it's relevant to a facial challenge. Sure. So the Director's position here is that they take a hands-off approach with the definition of death. They don't enforce anything. And there's a lot of reasons why we think that's by sections — the 102,000s of the Health and Safety Code. But laying that aside, as the Director is saying it's all on the doctors and the physicians to make the ultimate decisions, the physicians are saying the opposite. And so the broad and legitimate discretion that the Director is trying to hand to the physicians as the basis for Article III causation is what the physicians in turn and the medical providers are handing back to them. And that's what the Kaiser brief shows. But are the doctors saying — what is the page of the record that you're pointing to for this? In the excerpts of record, page 693, there's a heading there. And then page 702 as well, Kaiser pushes back and says, your problem is with the state, is with the legislature. Your problem's not with us. We just follow these mandatory legislative duties and frameworks. And so the issue with causation — again, we think the district court imposed a standard for causation. I'm sorry. I looked at the pages, but I don't see any — it doesn't seem to be a declaration. It seems to be a brief. So I maybe have the wrong page. It is a brief, Your Honor. This was Kaiser's position. It is a brief that they submitted to the district court. And what are you saying that the doctors said? The doctors pushed back when we first — they were part of the case originally as defendants. And so, to the director's point that they have all of the discretion here, this broad legitimate discretion, the doctor's point is, no, we don't. You're suing the wrong person. Don't look at us because we're bound by these state mandates. But bound to do what? We're bound to — I don't remember the exact language from the briefing, the heading on page 693 and then the text on 702. But — The heading on 693 is that CUDA provides a legislatively mandated statutory framework within which physicians in the state of California are required to make determinations regarding whether a patient is legally dead. Is that what you're referring to? That's the first thing, Your Honor. And then the second thing on page 702 is where they said, you're suing the wrong person. You need to pursue the director. So, they are required to say if you're dead. So, they may be required to say, I think this patient is dead according to CUDA. But they're not required to remove life support. No, Your Honor. It is nuanced. And so, we think the causation aspect of Article III standing, it's in the Bonneville Power case. The court talked about correlation. It used correlation as the standard. And so, we think the district court's decision here mirrors more the dissent from the Bonneville Power case that we've cited. It used a standard that was well above correlation. And just another point, Maya — You're saying because CUDA exists, there's a correlation where doctors say that people who are brain dead are dead? There is a correlation between the way that doctors act within the framework and the state's definition of that. And then the director's duties. And what about before CUDA? Were they acting the same way? Well, there's a line of cases from the state beginning with — we've talked about the Bartling case, the Balvia case. Up through the Donaldson case and even Doherty where doctors would go to court because they were afraid to turn off life support because they thought they would have civil and criminal liability. So, before CUDA, they did have great hesitancy to do anything in regards to turning off life support. And so, what the court said in Doherty was you don't have to come to court every time you want to turn life support — you have the parents' participation. And this case made the crucial turn away from that to say — and put this circuit on a trajectory to be in conflict with the state courts — to say, no, forget that. You don't have to have the parents' participation anymore. We think that's what led to the constitutional injuries that we're talking about here. And if I could just make a quick point on redressability. So, if there's someone who's in a hospital on a heart and lung machine, is the only way for that person to ever be declared dead, in your view, if the relevant relative says they are? Well, I think that's actually what the state cases tend to establish. But I think, Your Honor, that that really goes to the merits. And I think that this case needs a lot more briefing in the court below. I think we have to get past Article III causation and redressability first. And I think that's where the district court made its error. That's what this court is being called upon to address here. And so, as to redressability, I just want to note that what we're asking for here — the change to the definition, ultimately, the change to the death certificate — is actually mirrored by what the U.S. Supreme Court did in its landmark same-sex marriage case just a few years ago, where the lead plaintiff in that case, all he was asking for was a change in the state definition and a change to the death certificate of his partner. And he sued the Director of Health of the State of Ohio in order to do that. Well, there were other plaintiffs there, so the court really didn't have to do heavy lifting. But you're at 4-10. Let me pose one question with regard to redressability. What's really at stake? Is there money someplace? Are there benefits? Is there some real-world impact? And I'm not denigrating the other kinds of impact, but what is it that Plaintiff Fonseca has to win or lose? Number one is dignity, Your Honor. This case is about dignity for this family and for the other plaintiffs, Life Legal Defense Foundation. This case is about remedying an injustice that they see repeated again and again and again. For Fonseca, though, so for the family itself as opposed to the organization, can anything at this point remedy the interference, as you see it, with the right to life? Changing the death certificate would bring them some measure of relief. But it seems like in the complaint what you say is it might get them insurance or government benefits. I don't see how that brings back any life or gives anything related to the actual constitutional claim. Nothing can call their son back to life, but this is what can be done to bring them some measure of relief. But does the injury that you say is continuing, which I take it, is there a denial of insurance that's still continuing? No, the injury that we're asserting on behalf of the Fonsecas happened when their child was taken from them. Well, are there any benefits at stake? I mean, again, I'm not trying to make a ruling on dignity, but is that all this is about now? No, it's not, Your Honor, because if any benefits that would flow from this would be ancillary and would have to be pursued another way in another forum. So you're saying there are no insurance benefits at stake right now? I don't know whether there are benefits that could come to this family as a result of the ruling, but what they're seeking right now is, in this case, is dignity. And you're willing to stand your standing claim is based entirely on the dignity element? It's not based on dignity. It is primarily for the family. But, again, Life Legal Defense Foundation has its own interests here, and that's why they're important. But LLDF has no interest in this particular plaintiff's death certificate, do they? Not in the death certificate, Your Honor, but in the case, certainly, because they were a part of it. I guess we talked about this before, but your argument, you're trying to say that LLDF can bring an as-applied challenge, and so has some interest in this particular family, or are you acknowledging that they can only bring a facial challenge? No, I believe they can bring both, Your Honor. So when you get past that, then do you run into a problem with Rooker Feldman? No, you don't, Your Honor, because Rooker Feldman, what we have from the Supreme Court on Rooker Feldman, the most recent, most authoritative discussion about that was in the ExxonMobil versus Saudi Basic Industries case. And what they said in ExxonMobil was it was a unanimous decision in which the Supreme Court said, we've only ever applied Rooker Feldman in Rooker and in Feldman. We've never applied it in a case where there were parallel federal and state court cases, which is what we have in the present case. One, the federal case was initiated before the first state case ended. And so I think if you read between the lines in the ExxonMobil case, it's unlikely that the Supreme Court will ever apply Rooker Feldman again. But at the very least, they're not going to apply it in a case like this. For the organization's organizational standing for an as-applied challenge, are you, for the organization's injury, are you relying only on the expenses spent for the Fonsecas on this litigation? I'm sorry. Is the only injury to the organization that you think supports your as-applied challenge the money that the organization spent helping the Fonsecas with this litigation? Well, it's the money. It's the resources. It's the time, the factors that we've traced from the D.C. Circuit's case and Abigail Alliance for one. But that was a challenge to a whole policy. That wasn't just – I don't think Abigail relied on litigation costs in that case as supporting the organization's standing. Sure. They had both specific members that they were representing in that case as well as a broader aim and a purpose. Is there anything in the record that there's a monetary problem that your clients would incur if we affirm? They have incurred significant expense, Your Honor, in transporting their child to Guatemala for a season, in bringing him back to the United States. Would the difference in the date of death make any difference to their ability to pay those bills? I don't know that, Your Honor, because that would have to be pursued in another forum. That isn't something that's before us now to show. It is not. It is not. As I understand it, that could actually trigger some of the – But that has nothing to do with your standing argument. No, it does not, Your Honor. Thank you. Thank you. We've taken you over your time, but I'll still give you the five minutes in rebuttal that you wanted. Thank you, Your Honor. This is a complicated case. Thank you. May it please the Court. Oh, my apologies. Let's just give him a chance to sit down. May it please the Court, CM Siegel on behalf of Director Smith. The underlying facts of this case are undoubtedly tragic, but the district court correctly held that after three attempts, the plaintiffs here could not plausibly allege that Kuda's brain death provision caused doctors to remove Israel's life support. Let me ask you this. If the brain death part of the statute weren't there, if it were tied entirely to continuing functioning of heart and lungs, is it plausible to believe that the doctors would have entered a death certificate and would have ultimately ended life support? Your Honor, the doctors would have ended life support based on the determination, a proper determination, that Israel was brain dead. Well, but suppose the statute didn't offer, as an alternative definition for death, the lack of brain activity. Let's accept as a factual given that the finding was correct, that he was brain dead, but his heart and lungs were still functioning. If the California definition didn't include the brain death alternative, is it plausible that the doctors would have filed the death certificate and pulled the plug? To me, the answer is no. The doctors are operating based on the definition. Do you disagree with that proposition? Yes, Your Honor. Okay, you think the doctors would have ended life support anyway. And that's because they, in that context, they would have been guided by the widely accepted medical understanding that a person whose brain is no longer functioning is dead. Wait a minute. I just said, suppose the California definition did not include the brain death alternative. If the only definition offered by the state is one that tied to continued functioning of the heart and lungs, are you telling me the doctors would have, despite the continued functioning of the heart and lungs, have withdrawn life support because he was brain dead? So the causal theory here that they are relying on is that, in that context, there would be civil or criminal liability for withdrawing life support. And the reason that there would not be civil or criminal liability in that context is because it has been widely accepted in the medical community that a person whose brain has stopped functioning is not dead. CUDA does not dictate what physicians do once there has been a determination of brain death. It simply— So I think you're saying that the malpractice claim would lose because of medical standards, but it's still a hassle to be sued, so maybe the doctors— I mean, there's at least some possibility the doctors would care about being sued, even if the claim would fail. Right. And that's correct, Your Honor, but it also, by this point, has been so widely accepted by the medical community for such a long period of time that a lawsuit like that would almost certainly either not be filed or be frivolous. Then why did the California legislature bother to enact the statute? Because there were some questions about what these advances in technologies meant for various legal purposes, and let me give you a few. So one is in the criminal context, and that's actually what spurred California to adopt the brain death understanding. There was a question, for example, when a drunk driver hits a pedestrian and renders that person brain dead and the physicians subsequently remove life support, could the driver be charged with homicide or vehicular manslaughter? Another example was some ambiguity early on in the 70s and 80s about whether or not doctors could remove life support. Now, these were not lawsuits against doctors, tort lawsuits or criminal lawsuits against doctors. They were, in a few instances in some other states, doctors coming in and saying, we're not exactly sure what the right rule is here, and those courts that I've been able to find, those courts adopted the widespread medical understanding that a person whose brain had stopped functioning was dead. You know, in this case, there's a period of time between April and August during which there was pretty substantial legal activity. That's correct. And this may illustrate why it is, I mean, the answer you just gave, why the legislature decided it would be a useful thing for the state to offer up the ending of brain activity as an alternative definition to death, and there were court rulings along the way. In the end, life support was withdrawn, and I don't want to get into the particulars, but while there was the threat of more legal activity, I have a difficulty understanding in that context the suggestion that when you knew the mother was fiercely resisting and they were going to court, that the statute was irrelevant to the doctor's decisions. It seems to me inevitable. The doctors are going to weigh and take some comfort in the notion that the statute provides this brain death alternative, and that's what they relied upon in both in April and later in coming to the conclusion that the boy was, in fact, dead. And so the notion that there's not a connection between the statute and the actual decisions from the doctors is a hard one for me to appreciate. And, Your Honor, our point is just that if the statute were not around, doctors would follow accepted medical practice, and the accepted medical practice, it would be determined without reference to the statute. But it's not just a matter of the doctors at that point, because the courts are involved. There are lawsuits in at least a couple of different courts, including, I guess, this one had been filed by that time, and there had been temporary restraining orders issued. And the courts aren't going on their judgment of what medical practice is. The court's at least taking a glance at the State statute. And so I continue to be puzzled how, as a factual matter, we can be so confident the statute was just irrelevant and had no role in the causation. And in that context, and I think the virtue of deciding some of the issues in that context, is that the courts had before them the doctors and physicians who were actually making the brain death determinations and decisions to remove life support. And so some of these questions could be put to them in that context. Here, by contrast, you have what is essentially a facial challenge filed against a State official who plays no role in the determination of either brain death or decisions to remove life support. So if someone wanted to bring a facial challenge to CUDA properly, who would they sue? Our position is not, in this case, that there's a properly pled complaint with a very clear standing analysis and they simply sued the wrong plaintiff. It is, instead, that both their claim and their theory on causation is so inchoate that it's difficult to identify the right State defendant. But so is there no lawsuit that could ever properly challenge CUDA? Sorry, is that question as to the standing question or to the 11th Amendment? Well, it seems like you're trying to rely on standing to get out of the 11th Amendment. So let's assume we have a plaintiff with standing who wants to bring a facial challenge to CUDA. Who would they sue? And in a case where there's clearly jurisdiction, the Attorney General may very well be a proper defendant in that case because he is charged with defending the legality and constitutionality of California statutes. So should we, if that's the problem here in your view, should we remand so they can name the Attorney General instead of Smith? It seems very silly to have that be a difference on which anything rides. But that is not the only problem here, Your Honor. For the reasons that we have been discussing, there is a first antecedent causation problem. So, right. There are maybe standing issues and merits issues. But as to this Ex parte Young issue, I have a lot of trouble understanding why you're arguing anything about whether there is an official capacity against some government official. It's got to be that someone can be sued. So I just don't understand the point of this. And it's their burden to name the right official. They had multiple attempts in the district court. And in any event, there's no need for this Court to remand. But you didn't argue in the district court that she was the wrong official, I don't think. We did not. That's correct, Your Honor. So it's a little hard to blame them for not having the Attorney General in the amended complaint. That's correct, Your Honor. Yes. And would it help the State to remand, to change the complaint, to name the Attorney General? I don't understand what point that would give us. No. It is an alternative basis. We believe that this Court can and should affirm on Article III grounds. And in any event, there are at least two further grounds that this Court could affirm on. The first is mootness, which this Court was talking about with my friends on the other side. The district court didn't resolve this case on those grounds, but it did note that there was probably a mootness issue here, and the capable of repetition yet evading review exception was probably inapposite. For the reasons that you've discussed with my friends on the other side, particularly given that they don't seem to be contending that they, that Ms. Fonseca could get any money back, it would be moot. It seems like it very likely could be moot as to Fonseca, but would it be moot as to the organization? So a few points on that. The first is they have forfeited their organizational standing argument by failing to sufficiently open it up. I've got to say I don't see that. But let's go. What's next? Let's assume we're not on forfeiture. Your Honor's questions to my friends on the other side confirm that what they are seeking here is money for expenses on litigation. No, I don't think they're seeking that. I think they're seeking an injunction or a declaratory judgment invalidating CUDA. And then I misunderstood what they conceded as to their point. The second point, then, would just be that it would be odd in this case to conclude that Ms. Fonseca, that the case was moot as to Ms. Fonseca but not as to LLDF, particularly when if this issue comes up again, they could seek, you know, with another plaintiff and another patient. Well, the district court said that plaintiffs sufficiently allege LLDF's injury. And I don't see where you challenged that. So that seems to be aimed at the facial challenge, that at least in the pleading they've indicated an organizational interest that was sufficient for them to pursue a facial challenge. Why can't they do that in this lawsuit? Sorry, Your Honor. And that is correct. And, again, there may be some disconnect between what I understood their concession to be and what was put forward here. I think they were talking about their basis for organizational standing, not the relief they sought. So assuming they have standing to bring a facial challenge, it seems like that's not moot. So we may need to reach the merits as to the organization's facial challenge? Yes, Your Honor. Again, I think it would be anomalous to conclude that Ms. Fonseca — that the case is moot as to Ms. Fonseca, but not as to LDF, when this Court could address these issues in the context of a concrete dispute in the future if there were another patient who found themselves in similar circumstances. And the final point on this, Your Honor, is that — Well, would they need a concrete — I mean, do they have to have a concrete example for a facial challenge? No, Your Honor. I don't believe so. So, again, mootness would not seem to explain why LLDF doesn't have a claim to pursue. That's right, Your Honor. And then just the last point on LLDF standing is, you know, the district court correctly concluded that they had also not met their burdens on causation and redressability. And that's very similar. And the reasons for that are very similar to what we've been discussing. That discussion was entirely the same as the discussion with regard to Ms. Fonseca. That is correct. If it's a facial challenge, then they've moved on to a different set of issues. That is also correct, Your Honor. And I'd just like to come back to this last point, which is about the merits. And even if there were standing in this case, there's — any remand to address the merits would be futile. California law provides ample procedural protections before doctors can declare someone brain-dead. In addition, the State has a broad range of legitimate interests in providing a clear and uniform definition of death. And the one that has been adopted here, including the brain death provision, is similar to that that has been adopted by almost every state in the country and has been widely accepted by the medical community for a long period — for nearly half a century. And the district court actually reached the merits at the TRO stage, correct? That is correct. And we think her analysis and her instincts about them not being able — that they would not likely succeed on those claims were correct and that this Court can and should reach those points. Just a couple of final points, Your Honor, on Rooker-Feldman. You know, even if this Court concludes that they have standing to pursue their constitutional claim, Rooker-Feldman would, for the reasons Your Honor was discussing beforehand, clearly bar their claim to amend the death certificate that was raised in the State court, and the State court made a determination on that. Well, but the State court, as I looked at it, appeared to be applying the statutory definition. So if the statutory definition is successfully challenged, I don't think the State courts were passing on whether the State's statute somehow ran afoul of the Constitution. That's correct, Your Honor. That's the claim that's in front of us now. My point was only as to the request for relief to change — from April 14th to August 25th. That's what Rooker-Feldman really applies to. Well, again, I don't know why that's the case, because the claim there had nothing to do with the claim in front of us. Okay. I mean, the plaintiffs accept the facts that happened. They're saying they were wronged by that because the door opened by the State statute was improperly opened.  Yes. And I agree with that, Your Honor. And one last final point, Your Honors. What the plaintiffs really seem to be seeking in this case is judicial vindication of their belief that a person whose brain has irreversibly stopped functioning is not dead. But Article III courts only resolve concrete cases and controversies, and standing doctrine is intended in part to ensure that courts are not enmeshed in abstract challenges to the legality of government action. And that really is what underpinned the district court's decision here and why this court should affirm on Article III. Well, I've got to say, I don't really disagree with you there, except the district court said that the organization had sufficiently pled its interest. Now, maybe that would be subject to reexamination when you got past the pleading, but the pleading is all we have now. So is it really the case that there's not a case sufficiently concrete? If the organization had sufficient standing to qualify as an organization because of its investment, isn't that enough to make a concrete case? It had sufficient injury, Your Honor. The abstraction and the lack of concreteness comes from what function is the State I've struggled, though, with whether that's the merits or whether that's the organization's standing. I couldn't find an organizational standing case that really, once it said that it was standing under the havens line of the organization spending its resources, went on to ask whether the organization's perception of causation, that it was spending the resources for a reason, is valid. Can you point me to any case where organizational standing under the havens line looks at causation and redressability as carefully as the courts seem to with individuals? No, Your Honor, I cannot. I would just say that causation, there is a separate step here. It's not enough just to point to the injury. But I cannot identify a case along the line that Your Honor is asking about. If it's not reached now, it will be a bridge that will need to be crossed. But the question is whether now is the moment. And our position is that it is not. Okay. Thank you, Your Honors. Thank you, Counsel. We'll give you five minutes for rebuttal when you're ready. Thank you, Your Honors. Judge Freeland, I think you had an incisive question as to who the state would deem a proper defendant in this case. And I think the simple answer is no one. I think the state... Well, they said the Attorney General, so they are saying someone would be... Until we turn around and sue the Attorney General, if you take a look at the enforcement statutes in the 102,000s, beginning with Health and Safety Code 102,000, beginning with 102,175, and then down through 102,180. I think it's 102,195 that actually says where there are concerns about death certificates, it's the director at her initiation who is to call for the assistance of the Attorney General with enforcement, not the other way around. And prior to that, in the 102,180s, you have the director tasked with looking for irregularities and problems with death certificates. You have an enforcement and an oversight role within all things concerning death certificates. And our position on Cutta is simply this is the foundation for the death certificate statutes and for her role in that. And I don't think you can pull out the foundation without the whole house coming down. So that's to that issue. As to some of the other things that have been raised, the 11th Amendment immunity that's been brought up, one thing that I think it's important to reiterate is that not all statutes are enforcement type of statutes. And that's what this court spoke to in the EU case, if I'm pronouncing that right. Not all statutes are enforcement statutes per se. And that doesn't insulate them from 11th Amendment immunity. And we think the argument carries over to causation as well. Just because you have a definitional statute that's tied in and underlies other enforcement statutes doesn't insulate it from all liability and challenge. And if not now, then when? I don't know how much more concrete we have to get than the death of this child. I just don't understand where that argument is coming from. So if we thought we needed to reach the merits, I understand you've asked for a chance to do more briefing. Correct. Could you explain what you think hasn't been briefed yet? Yeah, absolutely. There are significant substantive issues. When you talk about the procedural due process, the substantive due process, the right of self-determination, and the right of privacy, when we delve into all those things, I think we need substantial briefing on what the Supreme Court has said in cases like Kruzan and in the Glucksburg case. We need to go through what the state courts have said in cases like Bartling and Balvia and Donaldson and all those lines of cases. And I'm sure the state is going to have significant things that they'll want to present in terms of their interests. What they've thrown out so far, for instance, this interest in the public good from the Henry Moffitt case, is a labor case, police powers case from the 1930s. That's not the type of state interest that's going to be able to justify deprivation of life. They haven't put forward a compelling interest in their briefing. And so I think this big issue, if the court were inclined to reach the merits, we certainly would request some supplemental briefing on that. And at the TRO stage, it seemed that the district court did reach the merits, but is what you're saying that you didn't have a chance to brief it adequately before that point? I think there are significant issues at stake here that would greatly benefit from more than just going back and seeing what we briefed at that stage, what they briefed, what the court said. So if there are no further questions, then I'll stop. It looks like we have no further questions, so thank you very much to both sides for the helpful arguments. The case is submitted, and I think we should take a five-minute recess before our next case.
judges: Wallace, Clifton, Friedland